Freda C. **CLARK**, Plaintiff,

v.

Clifford L. **ALEXANDER**, Jr., Defendant.

Civ. A. No. 77–1001.

United States District Court, District of Columbia.

April 18, 1980.

Patricia J. Barry, Washington, D. C., for plaintiff.

Robert Cattanach, Jr., Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUBREY E. ROBINSON, Jr., District Judge.

Plaintiff, Freda C. Clark, a retired Army employee, alleges in this Title VII action that she was deprived of equal opportunity for training, development, lateral reassignment and promotion under the Department of Army Career Program for Civil Personnel Administration (Career Program) because of gender; that she was denied equal employment opportunity on the basis of sex and subject to reprisal action because of her assigned duties in the Office of Employment Policy and Grievance Review (OEPGR), Office of the Secretary (OSA),

and Department of the Army (DA); and that she was denied promotion to the position of Director, OEPGR, GS–201–15, in retaliation for having filed a formal complaint of employment discrimination against the Army.

Upon consideration of the testimony at trial, the designated deposition testimony, the exhibits, Stipulations of Facts, and the files, records and proceedings herein, and in accordance with F.R.Civ.P. 52, the Court makes and enters its Findings of Fact, Conclusions of Law, and Order for Judgment as follows:

## FINDINGS OF FACT

1) Plaintiff Freda C. Clark has a Bachelor of Arts degree with majors in Psychology and English and a Master of Arts degree with a major in personnel administration and a minor in business and administration from the University of Tennessee (1940). She also has 15 college semester hours credit related to personnel management. From 1941 to 1950 Plaintiff worked in operating personnel offices in various and diversified and functional areas of personnel management. She has more than thirty years of supervisory, administrative and personnel management experience, with a record of consistently outstanding ratings in these areas. Plaintiff began her employment with the DA in 1950 as a Clerk-typist GS–3 in the OEPGR. She was promoted on October 1, 1950 to the GS–4 level, in 1951 to Correspondence Clerk, GS–5, and in 1952 to Employee Relations Assistant, GS–7, an assignment as principal assistant to Albert Kransdorf, then Chief of OEPGR. She advanced in this assignment to the GS–13 level in June 1962 as a result of non-competitive promotions based on job audits. On August 5, 1973 Plaintiff's immediate supervisor, James W. Bage, then the first Black Director of OEPGR, selected Plaintiff for promotion to the position of Employee Relations Specialist, GS–201–14, in which she served as his principal assistant and Deputy until her retirement on July 15, 1977. During her twenty-seven years of OEPGR tenure, she received seven letters of commendation, one Quality Step Increase, two Sustained Superior Performance Awards and fourteen "Outstanding" Performance Ratings. She has enjoyed an excellent reputation as an expert in Equal Employment Opportunity matters. She had primary program responsibility for all aspects of EEO within the Army prior to the establishment of the United States Army Civilian Appellate Review Agency (USACARA) in 1970. She furnished Army EEO and personnel officials throughout the world with verbal and written instructions, conducted training courses, wrote regulations, prepared a manual on conducting and preparing reports of investigation on EEO complaints, furnished newly appointed EEOO's with orientation, training, advice and assistance in performing their duties and responsibilities, and served as a liaison representative between the Army and the staffs of the White House, Civil Service Commission, Members of Congress, other Federal Agencies, unions and minority and women's organizations and groups. Her broad and in depth knowledge of civilian personnel administration and management is indicated by her educational achievements, her early years of diversified experience in operating personnel offices, her performance ratings, awards and citations, career appraisals and her job description for the position of Deputy Director of OEPGR. On June 20, 1976, she received the Army Meritorious Civilian Services Award.

2) The Career Program instituted by the Army in 1959 was its merit placement and promotion program for professional employees in the 200 series. This program was developed for the stated purpose of giving covered employees an opportunity to develop and progress in accordance with the program, consistent with employees' needs and Army requirements. It provided for planned career development of employees by grooming them to meet requirements for promotion. It is administered by the Office of Civilian Personnel (OCP) and the Director of Personnel serves as functional Chief of the program. Primary responsibility rests in the Chief of the Training and Career Management Division, OCP, which

has primary responsibility for the administration of all Army career programs. An Executive Secretary serves as head of the staff support for the Career Program. DA regulations on Career Management indicate that these regulations have been accepted by the Civil Service Commission as meeting the requirements of Federal Personnel Manual (FPM) 335. DA requested the Civil Service Commission to approve, as an exemption to Merit and Internal Placement, all positions covered by Army Civilian Career Programs. The Commission determined that the DA Career Management Program as set forth in CPR 950–01, essentially complied with the revised Federal Merit Promotion Policy, but required certain revision, including provision for maintenance for two years of a record of each promotion made under the plan.

3) Plaintiff elected to participate in the Career Program and her promotions and transfers were therefore determined by the Civilian Personnel Administration Referral System. Under this system, there is an annual screening by a reviewing panel of each career program participant to determine her qualifications for various types of jobs within her specialty in the DA. In making this determination, the panel considers each careerist's personal data file as compiled by the local CPO and forwarded to the panel. This data includes a computer printout (DA Form 2302–5) which is a "Career Employee Record" summarizing experience, education, training and self development, special skills, awards and availability. For each job at various grade levels, the panel determines whether a careerist is qualified for a promotion or a lateral transfer. In lieu of lateral transfer or promotion, the panel can defer consideration at the request of an individual or to permit one to gain additional experience in a new position, or to satisfy the Whitten Amendment requirement of one year in grade before promotion. A careerist may at anytime review the personal data pertaining to her that is being used by the panel. A careerist has the responsibility for furnishing information to her CPO to maintain the accuracy and timeliness of the data in the file.

4) When DA Headquarters receives a request for a job action to fill a vacant position, it matches the request with the referral list provided by the yearly screening panel to determine those individuals previously designated by the panel as best qualified for the specific job. Further screening is performed to ascertain geographic availability for the specific vacancy. This process involves no judgmental decisions.

5) From 1966 to 1972, Plaintiff reasonably expected developmental and promotional assignments under the Career Program. Despite Civil Service and DA regulations under which employees are entitled to receive published information concerning the availability of immediate promotion and career developmental opportunities, the DA practice was not to announce vacancies for promotions to be filled under the Career Program. Thus, during this period Plaintiff, like everyone else, was never officially informed when position vacancies occurred. Nor did DA comply with Civil Service Commission regulations which required that a record of promotion action be maintained and retained for two years, in order to permit reconstruction of promotion actions and evaluation of the fairness of the promotions made. Furthermore, DA failed to comply with regulations requiring the screening panels to record and maintain evaluation methods for obtaining final ratings of candidates or the criteria used in judging the categories in which individuals were placed, including the "best qualified". During this period Plaintiff received no referrals and thus was never given a career developmental or promotional assignment.

6) After 1972, Plaintiff vigorously pursued possible lateral or promotional transfers. Although she had a meritorious career record, referrals to which she was entitled never materialized. Moreover, the clear regulatory violations have persisted to the present date. Finally, a significant degree of tension existed between members of the screening panels (who were often the subjects of EEO complaints) and OEPGR staff members, including Plaintiff, who re-

viewed EEO complaints lodged against the Army and wrote findings of discrimination. Until 1974, when Hazel Roland, a white female, became a member, all of the screening panels had been composed of white males.

7) Supporting the evidence reflecting generalized, systemic discrimination, Plaintiff presented evidence concerning discrete instances, which is summarized as follows:

a. In late 1963 Eugene Berlin, an employee from OCP was selected for a position of Personnel Management Specialist, GS–230–14 with assigned duties as Deputy Director of OEPGR. Berlin had no substantive experience in the work accomplished in OEPGR. When Plaintiff contacted officials in the OSA Civilian Personnel Office for an explanation regarding her lack of consideration for the assignment and the exclusion of her name from the referral list, she was advised that they had no record of her registration under the Career Program.

b. In early 1969, Plaintiff learned that there was a vacant position of Employee Relations Specialist, GS–230–13 in the San Francisco Field Office of OCP. Plaintiff personally requested Mr. Robert R. Bruce, then Chief of Career Management, to afford her an opportunity for lateral reassignment to the position. Her name was not included on the referral list. Clarence H. Snow, Jr. was selected for the position.

c. On September 15, 1969, Plaintiff completed and submitted to Career Management Officials a form which stated that she was available for assignment world-wide with the exception of Vietnam. By letter dated December 1, 1969, Mr. Charles Mullaly, the Director of Civilian Personnel, advised Plaintiff that the screening panel had determined that she had demonstrated potential for advancement under the Career Program and that she would be considered for all career opportunities consistent with her qualifications, career goals, and stated mobility. Within the next six months officials responsible for Career Management had created USACARA, established eight GS–14 USACARA positions, filled seven of them, and had not included Plaintiff's name

on the referral list for selection consideration for any one of the assignments. The primary mission of USACARA was to investigate EEO complaints. Each of the GS–14 positions was filled by a male. Kenneth Young was the only selectee who had EEO experience.

d. In 1970 Plaintiff applied under a vacancy announcement for a position of EEO Investigator, GS–13, in Heidelberg, Germany. Russell Jacobs was selected for the position.

e. In 1971 Plaintiff was informed by Homer Russell, who worked under her supervision, that Career Management officials had issued a referral list for a position of a Management Employee Relations Specialist, GS–230–13 in OSA, that he was on the referral list for promotion consideration, and that the list did not include her name as a candidate for lateral assignment. Plaintiff telephoned the OSA Civilian Personnel Office and was told that her name was not on the referral list. She then inquired as to why her name was not on the referral list and was informed by Mr. Chapman that her name had not been referred due to lack of supervisory recommendation. He contended that her supervisors had recommended her for promotion but had not recommended her for lateral or developmental assignment. When Plaintiff inquired of her supervisors they advised her that they had done nothing to interfere with her receiving a lateral assignment.

f. In late 1970 Plaintiff applied for a position of EEOO, GS–14, in the Office, Chief of Staff (OCS), under a Merit Placement and Promotion Vacancy Announcement. Applicants and Career Program registrants were considered for selection. Plaintiff was told by Mr. Berlin that her name was on the referral list. Dr. Bruce Fleming was selected. Plaintiff asked Ms. Daisey Patterson, an EEO official who processed the selection in OCS why she was not interviewed for the job. Ms. Patterson advised Plaintiff that her name was not on the referral list. Ms. JoAnna Bryan, then an official in the OCS Personnel Office told Plaintiff her name had been deleted from

the referral list because of weakness in her education and experience.

g. Mr. John W. Marsh was selected for promotion to the position of Chief of EEO Office (Personnel Management Specialist, GS–201–14), OCP effective April 1972. Plaintiff learned of Mr. Marsh's promotion to this position while her EEO complaint was in the counseling process. Plaintiff noted that Mr. Marsh had no experience in EEOO. She requested that the investigation of her complaint include a comparative evaluation of her qualifications and those of Mr. Marsh pursuant to applicable regulations. Plaintiff's request was ignored.

h. The latter part of July 1974, Ms. Clark learned that the position of Chief of the USACARA Office in Heidelberg, Germany was vacant. Ms. Clark went to see Charles Weatherholt, a Personnel Management Specialist in the Career Management Office and asked to be considered for the position.

On August 8, 1974, Mr. Bage advised Plaintiff that the Career Management Office had informed him that her name was on the referral list for the position of Chief of the Heidelberg USACARA Office and had made inquiry concerning her availability. She asked him to report that she was available. She was promised but did not receive an interview for the position.

A letter of August 26, 1974, from Mr. James Stamps, Acting Administrator, USACARA advised Plaintiff that Mr. Clarence H. Snow, Jr., had been selected for the position based largely on his "demonstrated proficiency, first as an Examiner in USACARA, Sacramento, then as Chief, USACARA, St. Louis."

The referral list was issued on June 10, 1974, with an expiration date of July 10, 1974. Army CPR 950–10 states the following: "It is expected that a selection will be made from the available candidates on a referral list . . . . . Moreover, such career referral is valid only for a stated period of time and selections are not authorized after the *Expiration Date* show on the referral record." It is apparent that Mr. Stamps had made the selection prior to the time Plaintiff was contacted on August 8, 1974, regarding her availability for this job.

The referral list sets forth the following comment over Mr. Stamps' signature:

"A panel consisting of Mr. Ben Beeson, Mrs. Hazel Roland, and the undersigned selected Mr. Clarence H. Snow, Jr., on the basis of his demonstrated proficiency and in consideration of the career pattern of principal contenders."

Although Mr. Beeson served on the selecting panel, he testified that his knowledge of Plaintiff's qualifications was based on hearsay information. Ms. Roland who also served on the selection panel testified that she was unaware of Ms. Clark's qualifications. Both Mr. Beeson and Ms. Roland also testified that they had little or nothing to do with the selection process.

Mr. Stamp had personally supervised Mr. Snow, a white male, and all of those whom he actively considered, except for Ms. Clark, were white males.

At the time of Mr. Snow's selection as USACARA Chief, Heidelberg, in 1974, he had three college hours in English, no EEO experience prior to joining USACARA staff in 1970, had been working in the area of management Employee Relations since 1969 with supervisory responsibilities part of the time, and had one performance rating of "Outstanding," a Quality Step Increase in 1968, and one Sustained Superior Performance award in 1966. There is no record of career appraisals on his work performed from 1970 to 1974.

Ms. Roland testified that the Heidelberg Office which she supervised was very sensitive, that it operated with less supervision than the rest of the offices, that the previous incumbent had been removed from the position, and that it was important that the position be filled by someone who could carry on the continuity of the office without a long period for orientation and indoctrination. Mr. Snow's career printout shows, however, that he was not reassigned to the Heidelberg Office until November 1974, which was three or four months after his selection.

i. In April 1974, Mr. Bage prepared a Career Appraisal and Career Plan for Plaintiff, which Mr. Bennett approved. The Career Plan recommended Plaintiff for the USACARA directorship. In early September 1974 Plaintiff learned that Ms. Hazel Roland had been selected for the position of USACARA Administrator, GS–202–15, when a copy of correspondence was received by OEPGR which listed 17 sources of Congressional interest in her behalf and included information on which to base a reply. In October and November, 1974, Mr. Bland West, Deputy General Counsel, OSA, served as Special EEO Counselor in Plaintiff's complaint concerning her lack of consideration under the Career Program. Based on information provided him by Mr. Marvin Chapman, then Chief of the Training and Career Management Division, Mr. West reported that Plaintiff was not considered for the position of USACARA Administrator because she failed to satisfy the one year-in-grade requirement imposed by the Whitten Amendment.

8) On November 20, 1974, Plaintiff filed a complaint of sex discrimination and reprisal because of her failure to be promoted to Administrator, USACARA, GS–202–15. She contended that she was eligible for promotion to the position under the Whitten Amendment and that the stated basis for her exclusion from consideration was improper. With respect to these contentions the evidence established the following:

a) Recruitment for the position was begun in April 1973. Plaintiff was not appointed to a GS–14 position until August 1973, thus at the initiation of the recruitment period she was not eligible for promotions because of the Whitten Amendment nor would she have been eligible at the time of the November 1973 screening panel meeting unless upon application the Civil Service Commission had granted an exception. No such application was made and Plaintiff was not considered for placement on the referral roster for the position ultimately filled by the appointment of Hazel Roland in September 1974. However, as of the time of the Roland appointment, Plaintiff had been a GS–14 for 14 months and thus was not affected by the Whitten Amendment and eligible for consideration at that time. The Whitten Amendment played no part in Defendant's failure to consider Plaintiff.

b) While the Heidelberg position was somewhat sensitive because of its geographical remoteness and the circumstances underlying the removal of the incumbent, it did not require that the new head of that office be an experienced manager with a broad background. The time between Snow's appointment and his reassignment was more than sufficient to train proven, highly competent applicants, such as Plaintiff. While the selectee, Clarence Snow, had proven management skills that Plaintiff lacked, her demonstrated competence and her extended functional experience in case and review was an adequate substitute for management experience. The Snow selection resulted from the selectee's ties with Stamp. Plaintiff's sex and EEO activities contributed to her nonreferral.

c) In filling the position of Administrator, USACARA in 1974, the white male ad hoc panel used no crediting plan nor maintained any record of how it separated the qualified, highly qualified and best qualified candidates. The failure to maintain a temporary record with sufficient information to allow reconstruction of the promotion action and by not recording the specific qualifications and merit criteria used in judging individuals with respect to the various candidate categories violated applicable regulations (CPR 950–1.4–9c(2) and FPM 335.6–1b(3)). Additionally DA extended the area of consideration in filling the position by including three outside candidates on the referral list. Under DA recruitment and placement procedures, such extensions normally occur when there are not a sufficient number of representative women and minorities on the referral list for higher-grade jobs. These "outside candidates are at a competitive disadvantage unless other factors of personal merit clearly offset the absence of substantial or current experience in the career field concerned" CPR 950–1.2–6b(2).

On the referral list was a black man, James W. Bage, who was directing and managing an office in the functional area involved and who had demonstrated ability for effective performance at the GS–15 level. He was referred but not selected. The only evidence submitted by Defendant in explanation of the failure to select Bage, an Army minority candidate, and failure to refer Plaintiff, an Army female candidate, pertains to the personal qualifications of the selectee, Hazel Roland. Ms. Roland entered the federal service in the Social Security Administration in 1950 after two years of college training and approximately ten years of work in private industry in administration, public relations and personnel with a national trade association. She was engaged in public relations activities until she went to the Richmond, Virginia office of the Small Business Administration (SBA) as an Administrative Officer, GS–341 in 1952. From 1966 to 1968, she worked in the SBA Philadelphia regional office as a Personnel Management Specialist. In 1968 she became a personnel management specialist in the SBA Central Office in Washington, D. C. and became Chief, Employee Relations Division and Labor Relations Officer in 1969. She entered the personnel series at the GS–201–12 level in 1967 and was promoted to GS–201–13 in 1969. She became a GS–14 in the 230 series in 1971. She had twenty-five years of diversified personnel and management experience in SBA during which she received the 1974 SBA Gold Medal Award, a Quality Step Increase in 1973 and an Outstanding Performance Rating with a Quality Step Increase in 1970.

Ms. Roland had no substantive EEO experience other than EEO counseling in connection with her direction of the SBA appeal and grievance program and as it would relate to the Employee Relations Program for which she was responsible. She did not have any experience with the DA as an agency. She clearly had personnel management skills and experience essential for the Administrator's position that mitigated her lack of Army experience or substantive EEO experience. She was no more qualified than Plaintiff, however. Defendant's failure to refer Plaintiff and consider her for the above position reflects his desire to preclude individuals with significant EEO training from policy making positions.

9) In June 1976, Plaintiff applied under a Merit Promotion Vacancy Announcement for a lateral assignment to a position of EEO official GS–160–14 in Europe. She complained to her EEO counselor that her name had been improperly excluded from the referral list and he intervened and succeeded in having the initial referral list voided by Bennett, and in having a new panel constituted to consider a new list upon which her name did appear. No evidence was produced which explained or justified her exclusion from the initial list.

10) Plaintiff was a candidate for the position of Director, OEPGR, GS–201–15 which became vacant on the death of James Bage on December 13, 1976. She served as Acting Director OEPGR from Bage's death until July 1977 when Holly Hemphill, a white female, was appointed by Joseph Bennett. On January 2, 1977, Bennett gave Plaintiff a 130 day temporary promotion at the GS–15 level. Bennett evaluated Plaintiff's performance as Acting Director at the GS–14 level as "outstanding". He evaluated her performance as Acting Director at the Temporary GS–15 level as "satisfactory" because she required more supervision than Bage, her predecessor, consulted with Bennett daily about minor matters, and seemed to have problems with the job. This second evaluation violated the applicable regulations. See FPM 335.4–4(a)(2).

Hemphill had worked for Bennett as an EEO Staff Assistant at the GS–13 and 14 levels from 1972 to 1975. Among her duties was that of Federal Women's Program Coordinator. Upon occasion she represented Bennett, the Assistant Secretary and the Secretary. She had no supervisory responsibilities or experience during that period. At the time of her selection for the position of Director, OEPGR she was an employee of the Federal Labor Relations Council and was a recent law school graduate. She still had no supervisory experience, but in Ben-

nett's opinion had good potential as a fit replacement for Bage.

11) During the period 1962 to 1972, Plaintiff continuously applied for job-related training courses. These were denied her allegedly on grounds that she could not be spared because of the heavy workload, that she did not need the training, or that funds were not available. She specifically sought to take the Civilian Personnel Officers Course, a general course in civilian personnel management, and other courses for Civilian Personnel Officers. Training and self-development are relevant factors in evaluating and comparing the qualifications of personnel and significantly enhance opportunities for career advancement. Without these opportunities, Plaintiff was disadvantaged when these factors were compared with the experience of both Ms. Roland and Mr. Snow.

12) Subsequent to 1972, Plaintiff vigorously pursued potential lateral and promotional assignments. She was continuously spurned, in spite of her outstanding employment record.

13) Statistics with respect to the Personnel Management Career Program in DA Civilian Personnel Administration [1] for Grades 12 through 17 show that in 1972, women held 12% of the GS–12 jobs, 18% of the GS–13 positions, 4% of the GS–14s. From 1972, no significant change was reflected until one woman was appointed to a GS–15 position in 1975. In 1976 women constituted 31% of the GS–12s, 15% of the GS–13s, 16% of the GS–14s and 2% of the GS–14s (one woman, 43 males). In 1977, 5% of the GS–14s were female (2 of 41 positions); there was little or no change in female occupancy of the other grades. No women have held any GS–16 or 17 position.

## CONCLUSIONS OF LAW

1) This Court has jurisdiction over this litigation pursuant to 42 U.S.C. § 2000e–16. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

■ 2) The proscription against employment discrimination on the basis of sex and against retaliation for participation in EEO programs in §§ 703, 704(a) of the 1964 Civil Rights Act was made applicable to federal employees by the 1972 amendments to the Act, 42 U.S.C. § 2000e–16. *Berrio v. EEOC*, 18 FEP 1213 (D.D.C.1979).

■ 3) What establishes a *prima facie* case varies from case to case and is not a rigid formula to be applied without variation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Teamsters v. U. S.*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Furnco Construction Co. v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–2949, 57 L.Ed.2d 957 (1978).

■ 4) The burden of proof in a Title VII litigation always remains on the Plaintiff. After the establishment of a *prima facie* case, however, the burden of persuasion shifts to the employer. This burden requires the defendant to "articulate some

1. The breakdown by sex is as follows:

| 1972 | GS–12 | GS–13 | GS–14 | GS–15 | GS–16 | GS–17 |
|---|---|---|---|---|---|---|
| Male | 639 | 427 | 160 | 45 | 7 | 1 |
| Female | 235 (27%) | 37 (18%) | 4 (2%) | 0 | 0 | 0 |
| 1973 | 509 | 407 | 159 | 30 | 7 | 1 |
| | 215 (27%) | 51 (11%) | 4 (2%) | 0 | 0 | 0 |
| 1974 | 554 | 404 | 161 | 37 | 7 | 1 |
| | 221 (28%) | 54 (11%) | 7 (4%) | 0 | 0 | 0 |
| 1975 | 537 | 403 | 148 | 39 | 8 | 1 |
| | 222 (29%) | 66 (14%) | 9 (6%) | 1 (3%) | 0 | 0 |
| 1976 | 546 | 438 | 154 | 42 | 9 | 1 |
| | 246 (31%) | 75 (15%) | 16 (6%) | 1 (2%) | 0 | 0 |
| 1977 | 554 | 428 | 153 | 39 | 10 | 1 |
| | 289 (34%) | 81 (16%) | 9 (6%) | 2 (5%) | 0 | 0 |

legitimate, nondiscriminatory reason." *Furnco Construction Co. v. Waters, supra,* at 577, 98 S.Ct. at 2949, *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978).

5) Generally, there are two varieties of Title VII cases, those which involve "disparate treatment" of an individual and those which involve "disparate impacts" on classes of people. *Teamsters v. U. S., supra,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854; *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–432, 91 S.Ct. 849, 853–854, 28 L.Ed.2d 158 (1971).

6) "Practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co., supra* at 430, 91 S.Ct. at 853; *Teamsters v. U. S., supra,* 434 U.S. at 349, 97 S.Ct. at 1861.

7) The instant litigation presents questions of disparate treatment and disparate impact. Disparate impact involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters v. U. S., supra,* at 336 n. 15, 97 S.Ct. at 1855. The evidence establishes beyond doubt that pervasive systemic defects[2] existed and continue to exist in the DA's Career Program. Regulations designed to afford equal opportunity in lateral and upward career mobility were and are flagrantly violated. OEPGR staff members who participated in the Career Program were and are subject to systemic discrimination because the personnel who controlled promotions were often the subject of EEO complaints and findings of discrimination by OEPGR staff. This is evidenced by the fact that only one OEPGR employee has received a promotion through the Career Program since 1972.

Moreover, the statistics and trial testimony indicate beyond doubt that the DA refused and continues to refuse to promote qualified women to high level policy making positions. The system, by providing the personnel boards with unfettered discretion, had and has a disparate impact upon classes of people protected by Title VII, *viz.* women and OEPGR employees. Not only did Plaintiff establish a *prima facie* case of discrimination, *McDonnell Douglas Co. v. Green, supra,* but she easily met her ultimate burden of proof. *Furnco Construction Co. v. Waters, supra.* The pervasive systemic defects inherent in the Career Program operated and continue to operate to discriminate against women, who have suffered from prior discriminatory employment practices, and OEPGR staff who enforce the EEOA. Although the system is facially neutral, disparate impact runs rampant in the DA Career Program. *Griggs v. Duke Power Co., supra; Teamsters v. U. S., supra.*

8) Disparate treatment exists when an employer treats some individuals less favorably than others because of their race, color, religion, sex, or national origin. *Teamsters v. U. S., supra,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854. The evidence establishes that the systemic violations outlined above directly impacted on Plaintiff. The testimony indicated that resentment of findings of OEPGR staff that discriminatory hiring and promotion practices existed influenced screening panel decisions. Even had the regulations been followed, it would have required saintly discipline on the part of panel members to dismiss their feelings of resentment. The indefensible regulatory violations enhanced the omnipotence of personnel officers, thus providing an outlet for their resentment. Plaintiff proved a *prima facie* case under *McDonnell Douglas Co. v. Green, supra.* While Defendant then met his burden of persuasion by articulating that several of the discrete instances cited by Plaintiff were not manifestations of discrimination, *Board of Trustees of Keene*

---

**2.** The term "systemic defects" refers to defects in the DA's Career Program as it actually func- tions, not as it would function assuming compliance with all applicable regulations.

*State College v. Sweeney, supra,* Plaintiff ultimately proved that she was discriminated against both because of her gender and her employment in the OEPGR.

The dearth of referrals after 1972, in conjunction with Plaintiff's outstanding employment record and the systemic deficiencies noted above, leads inexorably to the inference of discriminatory intent. *See Washington v. Davis,* 426 U.S. 229, 253, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring). This evidence is further buttressed by overwhelming evidence of past discrimination, outlined *infra. See United Airlines Co. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Finally, the discrete instances presented by Plaintiff reflect that she was persistently discriminated against by Defendant on account of gender and EEO activities. Clark presented three instances where she was denied promotions to positions for which she was qualified. In one of the instances, Plaintiff was denied the promotion due to statutory grounds that did not exist. In the other two instances, Defendant resorted to violation of his own regulations in order to deny Plaintiff a promotion. Plaintiff was qualified for all three positions, and the selectee was never more qualified than she. It is clear that Plaintiff has met her burden of proving that there was disparate treatment, and that her failure to be promoted was premised on criteria that violated Title VII of the Civil Rights Act of 1964, as amended in 1972. *McDonnell Douglas Co. v. Green, supra,* 411 U.S. at 805 n. 18, 93 S.Ct. at 1825.

9) Plaintiff has also proven that the systemic deficiencies noted above serve to "freeze the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co., supra.* Defendant has not seriously disputed that, prior to 1972, Plaintiff was denied access to job related training programs and courses to which she applied and was entitled. Nor does Defendant dispute that Plaintiff, prior to 1972, received no job referrals even though she had a laudable employment record and vigorously pursued said referrals. It is uncontestable that Plaintiff's future prospects were deleteriously effected by past discrimination. While past discrimination does not give rise to cause of action under Title VII, *United Airlines Co. v. Evans, supra,* 431 U.S. at 558, 97 S.Ct. at 1889, the existence of past discrimination makes systems that perpetuate that discrimination suspect. *Teamsters v. U. S., supra,* 431 U.S. at 349, 97 S.Ct. at 1861. Defendant cites *Evans* as authority that past discrimination is merely collateral evidence of present discrimination, and that any claims of present discrimination resulting from past discrimination are not actionable. Evans did not challenge the *system* that perpetuated past discrimination, however. Rather, she claimed that as a result of past discrimination, she was presently being discriminated against in violation of Title VII. The Court rejected the notion that, as a continuation of past discrimination, she was presently being discriminated against. Rather, it distinguished between a discriminatory *result* obtained from past discrimination and a "present violation." *See United Airlines Co. v. Evans, supra,* 431 U.S. at 558, 97 S.Ct. at 1889 (emphasis in original). In *Teamsters v. U. S., supra,* 431 U.S. at 349, 97 S.Ct. at 1861, the Court affirmed its ruling in *Griggs v. Duke Power Co., supra,* that a *system* serving to perpetuate past discrimination (with the possible exception of a seniority system) violated Title VII. It is abundantly clear in the instant litigation that the DA Career Program, as evinced by the regulatory violations, the resentment of OEPGR staff by personnel officers, and the dearth of referrals to qualified participants such as Plaintiff, served to perpetuate past discrimination. Thus this case falls within the purview of *Teamsters v. U. S., supra,* because the Career Program served to perpetuate prior discrimination against Plaintiff.

## ORDER

Upon consideration of Plaintiff's request for relief pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1972, 42 U.S.C. § 2000e, *et seq.,* and the Findings of

Fact and Conclusions of Law related thereto, it is by the Court this 18th day of April, 1980,

ORDERED, that Defendant offer Plaintiff a promotion to a position at the GS–14 level effective November 20, 1972; and it is

FURTHER ORDERED, that Defendant offer Plaintiff a promotion to the position of Administrator, GS–201–15, or to one of like seniority, status, and pay, retroactive to September 29, 1974; and it is

FURTHER ORDERED, that if Plaintiff declines the foregoing offers of reinstatement, Defendant will, nevertheless, pay Plaintiff the difference between the pay she received and the pay she would have received had she accepted the above Ordered offers, up to and including the date said offers were made; and it is

FURTHER ORDERED, that Defendant shall correct Plaintiff's personnel records to reflect that she was a GS–14 from November 20, 1972, until September 28, 1974, and that she was a GS–15 from September 29, 1974, until the date said offers are made and shall pay into Plaintiff's retirement account the amounts necessary to bring that account into the position it would have been had she been promoted as Ordered above; and it is

FURTHER ORDERED, that Defendant shall pay to Plaintiff the amount of annuity she would have received from the date of her retirement to the date of Defendant's compliance herewith, less the amount of annuity payments she has received since retirement; and it is

FURTHER ORDERED, that Plaintiff is entitled to reasonable costs and attorney's fees.